UTICA MUTUAL INSURANCE COMPA-
NY, Southern Insurance Company,
Charles C. Lincoln, Jr., Clarence L.
Saunders, an infant, D. Burke Graybeal,
Guardian ad Litem for William Larry
Saunders, an infant, and Nationwide In-
surance Company, Appellees,

v.

TRAVELERS INSURANCE COMPANY,
Appellant.

No. 9192.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 16, 1964.

Decided July 31, 1964.

Alex. M. Harman, Jr., and Howard C. Gilmer, Jr., Lulaski, Va., for appellant.

Waldo G. Miles, Bristol, Va. (Ralph L. Lincoln, Marion, Va., and Jones, Woodward, Miles & Greiner, Bristol, Va., on brief), for appellee, Charles C. Lincoln, Jr.

Before HAYNSWORTH, BOREMAN and BELL, Circuit Judges.

**574**

HAYNSWORTH, Circuit Judge.

This case comes here upon objections to the Trial Court's instructions to a jury, upon the basis of which the jury found that one Lincoln was driving an automobile with the permission of its owners when he was involved in a collision with another vehicle. Automobile liability insurance coverages were dependent upon the answer to the single question submitted to the jury.[1] We think the objections to the charge were well founded and, since they were presented to the District Court at the proper time, we reverse the judgment and remand the case for a new trial.

Mr. and Mrs. Charles C. Lincoln, Jr. and Dr. and Mrs. George Killinger had been good friends for many years. Lincoln and Killinger knew each other as children when they grew up in Marion, Virginia, and Dr. Killinger first met his wife-to-be in the Lincoln's home while she was on a visit to Marion. The two couples were close friends and remained in touch with each other when the Killingers moved to Washington, D. C., and later to Tallahassee, Florida, while the Lincolns moved to Miami Beach, Florida.

Dr. Killinger was a professor at Florida State University, and he and Mrs. Killinger maintained a home in Marion, Virginia, which they occupied in the summer months. This, the Lincolns knew, so when they sold their house in Miami Beach in January 1962 and decided to move back to Marion, Virginia, they telephoned the Killingers and arranged to rent their Marion home, fully furnished, during the remainder of the winter and spring months.

In April 1962, Mrs. Killinger drove up to Marion from Tallahassee for a visit. She had some business to attend with a public accountant in Wytheville, Virginia, and she wanted to see her son, then a medical intern at Charlottesville, Virginia. She was invited by the Lincolns to be a guest in her own home during her visit to Marion and her side trips to Wytheville and Charlottesville. She accepted the invitation, and during that visit a conversation occurred between Mrs. Killinger and Lincoln, which is the basis of Lincoln's claim that he had express permission to use the Killinger's automobile later that summer under the extraordinary circumstances which will presently appear.

Dr. and Mrs. Killinger owned a relatively new 1962 Dodge station wagon, which Mrs. Killinger had driven to Marion from Tallahassee for her April visit. In Marion, she told Lincoln of the excellent gasoline mileage she had gotten on her trip from Tallahassee and bragged about her Dodge and expressed her pride in it. Lincoln, appropriately, owned and drove a Lincoln Continental, but he testified that he had been interested in a Dodge station wagon and had talked to Mrs. Killinger's brother-in-law, a Dodge dealer in Marion. He was skeptical of Mrs. Killinger's statements about the automobile's gasoline mileage, and he testified that he inquired of her about the push button transmission controls, to which Mrs. Killinger responded that she had grown accustomed to them and liked them very much. According to Lincoln, Mrs. Killinger told him during the course of that conversation: "Take the car and try it out any time, and I think you will

---

1. If Lincoln was using the automobile with the permission of its owners, the owners' insurance, under its omnibus clause, would apply and provide the primary protection for Lincoln's liability. His own liability policy, in that event, would provide secondary coverage for it contained the usual provision extending its coverage to Lincoln's permissive use of nonowned vehicles. If Lincoln's use of the automobile was not with the permission of its owners, the third parties' insurance, because

of its uninsured motorist endorsement, would provide protection for them, except that there is, as yet, an unadjudicated question as to whether that policy had been effectively canceled or had lapsed before the collision.

The real party-in-interest here is Lincoln, rather than the tort claimants against him; for the evidence indicates he owns valuable properties and that judgments against him would be collectible.

agree with me that it is probably the nicest car you have ever driven." Mrs. Killinger also testified that she had discussed with Lincoln the gasoline mileage she got in her Dodge, and testified that she told him to "try it out and see for yourself."

Nevertheless, Lincoln did not undertake to drive the Dodge station wagon while Mrs. Killinger was staying with the Lincolns in the Killinger home in Marion during April 1962. She returned to Tallahassee, and later, at the end of May, she and Dr. Killinger drove back to Marion and spent the summer in their home there, the Lincolns having vacated it in late May.

The two couples saw each other on occasions during June and July 1962, and on August 11, 1962, the Lincolns gave a party for a male guest of theirs. They invited the Killingers and a Mrs. Boyd. The group had cocktails at the Lincoln home and about 9:00 o'clock that evening went out to dinner. After they had finished their dinner, sometime between 11:00 o'clock and midnight, they stopped by the Killinger home to show it to the Lincolns' guest, and then the entire group agreed that they would go to the home of Mrs. Boyd, some five miles east of Marion. The six were in Mrs. Boyd's automobile, which they had used to go to the park where they had dined, and it was decided that they would pick up the Killinger automobile which had been left at the Lincolns' home, so that the Lincolns and the Killingers would have a means of returning to Marion from Mrs. Boyd's residence without requiring her to make another round trip. For that purpose, they drove by the Lincolns' home, from whence Mrs. Boyd drove Mrs. Killinger, Mr. Lincoln and the Lincolns' guest on to her home, while Dr. Killinger and Mrs. Lincoln followed in Dr. and Mrs. Killinger's Dodge station wagon. At Mrs. Boyd's there was piano playing and singing and Mr. Lincoln testified that at approximately 1:00 o'clock in the morning

he was ready to go home. He found his wife, his guest, and the Killingers unresponsive to his suggestion, so he walked out of the house and entered the backseat of the Killingers' station wagon, where he went to sleep. Sometime later, Dr. Killinger came out to check on Lincoln, saw that he was asleep in the back of the Killingers' station wagon and rejoined the others who were still singing and enjoying themselves within.[2]

Sometime between 2:00 and 3:00 o'clock in the morning of August 12th, Lincoln awoke. He was irritated that the others had not yet come out, and he saw that the key was in the ignition of the Dodge station wagon. He testified that he then recalled his conversation back in April with Mrs. Killinger when he was told that he might try out the automobile. He also said he thought that if he started up the motor, the noise might fetch the others out. He started up the motor, drove out of Mrs. Boyd's yard and turned to the east, away from Marion in the direction of a motel, where, he admitted, he had in mind stopping and spending the night. However, he ran into fog, abandoned his intention of going to the motel, and decided to return to Mrs. Boyd's. In the process of turning around, he stalled the motor. Without his glasses, he could not see the labels on the push buttons and thus encountered difficulty in restarting the engine. While thus partially blocking the roadway in the fog, an automobile occupied by a young couple and their baby crashed into the stalled station wagon.

It was under these circumstances that the Court instructed the jury:

> "For instance, if you believe from the evidence that in April, 1962 Grace D. Killinger gave to Charles C. Lincoln, Jr. express permission to use the Dodge station wagon and that this permission was without limitation in time and continued through August 12, 1962, then you may find that he was on that date

2. Lincoln testified he was awake when Killinger came out, that Killinger inquired if he was all right to which Lincoln responded that he was fine.

operating the Dodge station wagon with the express permission of Grace D. Killinger."

■ There was objection to this charge upon the ground that it ignored the implied limitations of Mrs. Killinger's offer to let Lincoln try out her automobile to see whether or not he liked it or to check its gasoline mileage. Since no one disputed the fact, as testified by Lincoln and Mrs. Killinger, that such permission had been granted in April and was not expressly limited in time, and there was no evidence of a subsequent express withdrawal of the offer it was suggested that the Court's charge, without amplification and qualification, amounted to a direction to the jury to find that Lincoln's use of the automobile in the early morning hours of August 12th was with the express permission of Mrs. Killinger. We think this objection valid.

Such a friendly offer necessarily imports implied limitations. Neither offeror nor offeree can reasonably understand that the offeror intends that the offer may be accepted without regard to the convenience of the offeror. Certainly, Mrs. Killinger could not reasonably have been expected to have intended that Lincoln, months later, might, without speaking to Mrs. Killinger, take her automobile on a trial run at a time when he knew that she was in great need of its use. It is highly questionable that he might reasonably have understood that he had express permission to drive the automobile for the purpose of seeing whether or not he liked it in the early morning hours of August 12th when he knew the Killingers, his wife and guest were dependent upon it for their return to Marion. Beyond question, he had no express permission to use it for the purpose of going to a motel and there to spend the remainder of the night, which he admitted was in his mind as he drove eastward from Mrs. Boyd's home. Indeed, Mrs. Killinger testified that she

had no intention in April of authorizing such a use of her automobile as Lincoln exercised in August. Obviously, she did not. It can hardly be doubted that the remainder of the party would have been quite put out with him when they undertook to leave Mrs. Boyd's at approximately 3:00 o'clock in the morning and discovered that Lincoln and the Killinger car were gone, were it not for the fact that they supposed someone had come along and stolen the vehicle while Lincoln slept in the rear and were thus more concerned about him than annoyed.

■ Under all of the circumstances, we do not now decide whether the testimony created an issue for the jury. The fact that the Killingers and the Lincolns were close friends is not alone enough to support an inference of permission.[3] There was also testimony, however, although vague and uncertain as to time, that Mr. Lincoln and his chauffeur had driven other automobiles owned by the Killingers in previous years. And the conversation in April, with all of the other circumstances, might permit a fact finder to conclude that there was permission to Lincoln to use the vehicle that night for the purpose of trying it out, if the trial was so limited in duration as not to be a probable imposition upon the Killingers. However, no fact finder ought to be allowed to consider the limited permission granted by Mrs. Killinger in April to be express permission for Lincoln's use of the vehicle on the morning of August 12, 1962, without regard to the particular circumstances of that use. The jury should have been plainly and carefully instructed that the permission granted by Mrs. Killinger in April should be disregarded by them, unless, under all of the circumstances, they should find that at that time and place Lincoln reasonably understood that he had permission then to use the automobile, that his use was for the purpose of trying out the vehicle and not for the purpose of abandoning his wife, friends and guest for the remainder of the night.

3. Mason & Dixon Lines v. Martin, 4 Cir., 222 F.2d 328.

The District Court also instructed the jury that it might find implied permission from all of the circumstances. We find the charge respecting implied permission unobjectionable, provided the charge dealing specifically with express permission points out to the jury the implied limitations inherent in the general permission granted in April.

Whether the evidence at a new trial will be sufficient to create a submissible issue, we do not now undertake to predict. That is a question for another day, which the District Court may consider when the evidence is in.

The case will be remanded for a new trial.

Reversed and remanded.